Our next case this morning is Edmonds-Radford v. Southwest Airlines, number 20-1132. Counsel, you may proceed. May it please the court. Mr. Carroll, my name is Kathleen Donnelly and I represent the appellant, Mrs. Krista Edmonds-Radford. Ms. Radford's complaint asserted four claims. Discrimination, failure to accommodate, and retaliation arising out of the first termination and retaliation arising out of the second termination. These claims are brought under ADA, ADAAA, and the Rehabilitation Act. It is undisputed in this case that the impact of the exhaustion requirement for any of these claims. I would like to start with addressing the Rehabilitation Act issue and then move on to each claim and how the court failed to consider the appropriate standard for application of summary judgment under each of these claims. As to the Rehabilitation Act, Your Honor, the arguments of Southwest were two-pronged. One, they applied a limited or they actually advocated for application of a limited reading of the Rehabilitation Act to only apply it to services and programs. This limited reading has been explicitly rejected by the Congress when it amended the Act in 1987. The Act specifically addressed the issue and held that any corporation that receives federal financial assistance as a whole will be subject to the Rehabilitation Act and its requirements. As to the second piece, the argument was that Southwest has not received any financial assistance. It has been providing services. Again, the evidence here has been conclusive. We had the competing statements from Southwest, one through its chief financial officer, and actually we had the representations by Mr. Gukin, who was and has been the managing director of tax and controller. He testified specifically to the issues that are related to the Rehabilitation Act. Every single statement in his testimony, however, has been contradicted directly by, one, the Southwest has made to the SEC, to its own shareholder in its annual reports, and to the Fifth Circuit in its lawsuit versus Delta. As to those issues, it has been clear that Southwest has been an equal partner with the City of Dallas and the partnership that was created to modernize- Counsel, can I interrupt you here? I guess I'm not hearing you say what I think you need to say to pull Southwest in here on a Rehab Act claim, which is that they actually received, didn't just benefit from, but received federal financial assistance. I apologize if I haven't said it as that. I will articulate that, that yes, Southwest has been receiving the federal funding. As the Court is aware, of course, the Supreme Court has made it clear that when you talk about federal assistance, it can be received directly or indirectly. In this case, through that partnership, we know that Southwest received at least $40 million when it came to modernization of the aprons. You're talking about the Love Field project? Correct, Your Honor. The arguments that we made were three separate arguments. Would that mean that if a corporation just happened to use Love Airport for their travel business, they were otherwise unrelated to Love, but they just flew back and forth from there because their regional headquarters was there, that they would be subject to the Rehabilitation Act because they took benefits from the modernization of Love Field? No, Your Honor. The difference between South- Southwest here taking a benefit of the project. I'm agreeing with Judge Morris. I just have real trouble seeing how they actually got the indirect benefits, but I don't see how they fall under Rehabilitation Act. Judge Rebell, I think the cancellation is very simple. Mr. Gutian, as I mentioned, he is the Managing Director of Tax and Controller, right? He's in charge of accounting. During the deposition, he was asked spot on, would you depreciate any assets from this project on Southwest's accounting? The answer was no, because we don't own it. Then you look at Southwest's representation to the SEC and its shareholders, and it is undisputed that Southwest has been in fact carrying the assets from this $40 million receipt of the federal funding on its books. United, Delta, no other airlines is carrying assets from a federal grant on their books. There is a difference between Southwest and the rest of the airlines right there. When you have an airline that is carrying those assets on its books, that is claiming credit for its depreciation, that is going to stay there for another 20 years, that has guaranteed the bonds, that has used its own debt, that has been paying debt services, that has invested as it has alleged. What if, in fact, Southwest probably improperly accounted for that? Does that bind them to the being considered a recipient of the funds? Maybe that was a mistake in their tax contribution, but that doesn't decide the fact we have to address for a EEOC, a Rehabilitation Act claim, does it? Of course, it is conclusive, Your Honor. These are representations to the SEC. These are not tax mistakes. These are consistent representations to the SEC, to their own shareholders, year after year in their annual reports to the Fifth Circuit that we have spent millions of dollars in this investment, that we are an equal partner. We are carrying these assets on our books. This is not something random that came as a benefit that you just happen to be at so-and-so airport and we are one of the 10 airlines that exist there. You don't carry assets from the federal government. Counsel, I know we've got a lot of ground to cover. We're already halfway there. Let me just jump to a question about your reasonable accommodation claim. You say in your brief that your client had informed all of her trainers and supervisors in Denver about her disabilities and requests for training as well. How did she inform them? What does the record show? How did she inform them that she had a learning disability? Yes, Your Honor. That's a great question, Judge Madison. We have the deposition statement in this case where she was asked point blank, what did you inform your supervisors? And he says, in no uncertain terms, I had a learning disability. That is at volume two, page 686 to 87, which is the deposition pages 120 and 21, that he specifically says, I had a learning disability. I told that to the people in Dallas. I told them to the people in Denver. Anything other than the deposition? Your Honor, this is a summary judgment. I understand. Is there anything other than the deposition? No, that was her testimony during the deposition and that's what we rely on. All right. Let me ask you a follow-up. If the supervisors were informed of her disability and she asked for additional training and received it, where is the failure to accommodate? Yes, there wouldn't be, but the issue is that none of that happened. It was very clear in Dallas. Did she get additional training? She got more service training in Denver. Correct. In what she did not need, right? So you have two things. They say you're doing perfectly fine at the counter. You have all these problems at the gates and let's go and fix that, right? What do they do? They provide more training in where she has no problem, which is at the counter. They do not provide adequate training at the gates and it's not adequate in two ways. Counsel, she got three more days training at the gate, didn't she? She has a learning disability, Your Honor. She needs more training. Counsel, my question is this. Did she get three more days training at the gate? Yes or no? And then you can explain. Correct, Your Honor. She got three more training by people who are not trained, who did not even know that she had a learning disability, who did not provide the training that she needed in an atmosphere that did not have the noise. Well, now wait a minute. Wait a minute. A minute ago, you said she did tell them that she had a learning disability. The supervisors. But the supervisors were not the ones who provided the training. They put her with her co-workers. You're standing right there across her. Go ahead and train her. Is there anything in the record to show that her trainers didn't know about the disability? Yes, Your Honor. We asked Mr. Watkins during the depositions, did you ever inform the trainers that she had a disability? The answer was no, point blank. But they did make arrangements for additional training based on her telling them that she had a disability. Correct, by people who were not qualified to provide the training and didn't provide the training that she needed. That's why Mr. Watkins himself described during the deposition what would have been adequate that they were planning to do after they would reinstate her. That was the best description of the kind of training that is adequate for somebody with a learning disability. Not putting them with their co-workers who are working across the aisle to say, hey, by the way, as you're working, also keep an eye on so and so. So they're trained without telling them that this person has particular needs that needs to be met in order to actually provide meaningful training, not to just click a box and say, yes, we did provide three more days of training. If I may, Your Honor, I would like to reserve the remainder of my time for rebuttal. Thank you, Counsel. Thank you, Your Honor. Carroll. May it please the Court. Good morning, Your Honors. My name is Tom Carroll on behalf of the Defendant Appellee, Southwest Airlines. Your Honors, I have a few things in mind, something of an agenda, so to speak, of my own. But it's apparent to me that the Court is well versed in the party's briefs and familiar with the record. And so what I'm most interested in doing today is discussing anything that might be on your mind or answering any questions that you might have. So before I go any further, let me pause and ask if there's anywhere in particular the Court would like me to begin. Well, she, Ms. Donnelly says that the training was insufficient at the gate. In her briefs, she said it was because they weren't real trainers. But now she's saying they really didn't do any training at all. They just kind of looked at her once in a while over there. Do you have anything to say about what the record shows on that? I do, Your Honor. First of all, I think the record is very clear and replete with instances that the plaintiff did, in fact, receive additional training above and beyond what would normally be provided to customer service agents, including the sworn declarations of the three decision makers who testified as such. It's reflected in Exhibit A to the Benzie Declaration at Volume 2 of the record, page 353, that talks about in the past tense how the plaintiff had already opted to take advantage of additional training. It's further reflected in the plaintiff's own Exhibit 22. This is Volume 5, the sealed part of the record, beginning at page 47 and going on for 53 pages. And then finally, it's represented in page 800 of the record on appeal, which just picks up in January at the very tail end of things, that shows an additional two weeks or 10 days worth of training. As to who provided the training, Your Honor, the ADA only requires reasonable accommodations. It does not require companies like Southwest to provide the employee's reasonable. And that really also goes to Your Honor, the fact that she did not request an accommodation for her disability. We know that, at best, she told her supervisor she had a learning disability. We also know that she requested more training. But as this court said very clearly in the EEOC v. C.R. England case, in italics, I may say, the plaintiff's job or the employee's job is to make a request for accommodation for her disability. And in this case, we just don't have a connection between the two. But in any event... Counsel, if she disclosed her disability to her supervisors in Denver, number one, and number two, asked for additional training, why isn't it a fair inference, especially at the summary judgment stage, to say that she was asking for extra training because of her disability? I mean, you say there's no connection, but... So we'll draw an inference. Aren't we supposed to draw inferences in favor of the plaintiff at that point? You are, Your Honor, but in this case, I don't think it applies. And I would go back to the C.R. England case itself. In that case, everybody knew that the plaintiff had a disability. It was HIV. And in that case, everyone knew that the plaintiff was asking for time off. I believe he even referenced time to go see my doctor. And the court held that he just did not connect the two. And I would say the same is true here. If she's a learning disability and she's asking for more training, I don't think that she connected the two. But most importantly, Your Honor, as your question alluded to during the appellant's argument, Southwest did provide a reasonable accommodation. It was good training. It was above and beyond what other people in her situation would be receiving. Well, and here's where I have a question. It's not enough just to use the magic word, we gave her more training. She's saying it wasn't adequate training. How can we decide that on summary judgment? How can we say that there's no dispute about adequacy? It seems to me that's very hard to decide without evidence. It may be, Your Honor, but it has been done. The first case I would point the court to is a Tenth Circuit's decision in the Gonzagauski case, which is cited in our briefs, where under the Rehabilitation Act, the court said the Rehabilitation Act does not grant relief to one who is incapable of performing a job, even with additional training. Similarly, in the Profsguard case out of the District of Utah, which we cited, that case involved an ultrasound technician who indisputably received more training, and Ms. Edmonds-Radford unquestionably received additional training above and beyond what she would have received. In a Profsguard case, the plaintiff said, well, only if I had some more training, maybe I'd be able to do the job. And the district court there recognized, correctly, I would say, that at some point, it becomes speculation. You're speculating as to whether you can, in fact, perform the essential functions of the job. And here, Ms. Edmonds-Radford could not perform the essential functions of the job. Thank you. I thought you were, I'm sorry, Judge Ebellard. No, no, no, I'm done. I thought you were making a distinction in your brief also between what she may have informed her supervisor in Dallas versus what she told the folks in Denver, supervisors in Denver. And I'm not, I want you to expand on that distinction a little. She's suggesting that she told both, that her deposition says, I didn't just tell the people in Dallas that I had a disability, I actually told the people in Denver that I had a disability. Do you support that? I'm sorry, Your Honor, I didn't mean to interrupt. We would say it doesn't. And this is in the answer brief at page 44, in particular, our footnote 10. As we read the evidence, the plaintiff has made clear that when she talks about whom did she inform of her learning disability, that that was directed to her time in Dallas, this two-week period of time when she was in Dallas for training. And I might mention that the record is very clear that the plaintiff does not have any complaints about her time in Dallas. So that's our position there. Have I answered your question? I guess, I guess I'm wondering why if she told, if she truly did tell people in Dallas, and she said she did, that she had a learning disability. And if, as Judge Matheson says, we can infer that, that because of that learning disability, she needed more training. Why can't we also infer that that information would certainly be relayed to her eventual supervisors in Denver? And that they'd be aware when she came on that she has this disability. So to answer your question, I would first, once again, reiterate that she did receive the accommodation that she requested. So I think the court doesn't even need to decide did she, in fact, properly make a request. But as to your question in particular, I think this that you're supposed to contact the accommodations and career transitions department or the ACT department. And again, this is coincidentally also page 44 of our brief, where we cite some case law that suggests that the 10th Circuit has said in dicta that not following those procedures may in and of itself be insufficient to have made a proper request for an accommodation for disability. But did anybody tell her that? Did anybody say, is there any evidence? Hey, you may have a claim, but you better say it to someone else, not to me. The answer is no, your honor. And it would be speculation as to why no one told her that. But I would say it's our position that she never requested the accommodation. So no one would have had the opportunity to tell her to go ask someone else instead. Counsel, I am trying to sort out your arguments. It almost seems like you're making some alternative arguments because on the one hand, page 40 of your brief, you refer to her unknown disability. And yet you're also saying that she received reasonable accommodation for everything she requested, but you have also argued that she didn't ask for reasonable accommodation in Denver. What is your position in very simple and direct terms on the reasonable accommodation claim? Your honor, let me see if I can track the district court's decision on this. And it of a failure to accommodate claim. And we have several alternative arguments. You're exactly correct. Any one of which is enough to affirm the district court. If this court agrees, first of all, we would argue that she's not otherwise qualified. The second prong of her prima facie case to perform the duty, the essential job functions. The second is- Wait, wait, wait. Why isn't she not otherwise qualified? Well, that's a two-step process, your honor. The first to be whether the plaintiff can, or the employee can perform the essential job functions without an accommodation. I think there's no question in this record that she could not. The second question then becomes, is there a reasonable accommodation that would allow her to perform the essential job functions? It's our position that Southwest provided her that exactly the training that she requested, the additional training above and beyond what other people would have received. And whether you call that a reasonable accommodation or whether you call that able to perform the essential job functions. You say in your brief, there is no accommodation that would have enabled her to do her job. How do we know that? Isn't that an open question? I mean, she got some additional training in Denver, but how can you say that there isn't anything else that might've worked? Well, we do know that whatever it is that she allegedly requested additional training, if you grant her that she made that request, that we provided it. And the ADA doesn't guarantee that an employee gets their requested accommodation. It only requires reasonable accommodations. And your honor, I think the additional training that she received, as reflected through her 50 day review, the list of training at 800 of volume two and the record on appeal, and the 53 page exhibit of people talking about the training that she received. It is our position going back to question that if the court finds that she's qualified, and if the court finds that she properly requested an accommodation, then in the end, Southwest reasonably accommodated her disability as the law requires. Well, you talked about 54 pages and so forth. When we go through the record, will there be extensive discussion of exactly what that training at the gate consisted of those last couple of days? I think so, your honor. This is at plaintiff's exhibit 22, volume five of the record at page 47, which is a compilation exhibit from the plaintiff's deposition that the plaintiff introduced in the record below. That is, I believe in chronological order, describing at the end of each day, what the different trainers did. Here's what we worked on. Here's how it went. Here are the concerns and the things that Ms. Edmonds Redford is not Your honors, the other thing that I wanted to make sure we touch on is the Rehabilitation Act, and in particular, this idea that the statute has been amended since the case law that we cited. That is unequivocally true. But it doesn't go so far as the plaintiff would have it go. I want to direct the court in particular to section 504 of the Rehabilitation Act, which is 29 USC 794. And when Congress amended the act, they added a definition of program or activity, and they made it very clear that an entire company like Southwest can only be covered as a whole in two circumstances. The first is when they receive federal financial assistance as a whole. And the second is when they're in certain industries, education, health care, housing, social services, industries that don't apply to Southwest. There's also no allegation here, or even argument that Southwest received federal financial assistance to the company as a whole. All we have is Love Field and these loan guarantees to Airtramp. So for other... Well, Ms. Donnelly said that Southwest carried on their books the Love Field asset, which would imply that they considered one of their assets, this project that was improved with federal funds. How do you respond to that? Two ways, Your Honor. First of all, to finish the definition of program or activity. For companies that do not receive federal financial assistance as a whole, the definition and therefore the act only extends to the entire plant or other comparable geographically separate facility. And so the first answer to your question is that regardless of how Southwest carried this information, there can be nothing more geographically distinct than Denver and Dallas. And so even if you give the plaintiff everything she's arguing as to Love Field, it doesn't extend to Denver. But even more than that, Your Honor, I would take this court back to the Supreme Court's decision in the Paralyzed Veterans case or U.S. Department of Transportation v. Paralyzed Veterans. And in particular, I take you first to page 22 of the plaintiff's opening brief, where it's very clear and affirmed in her reply brief that as to Love Field, her entire argument stands upon grants made under the Airport Improvement Program. Your Honors, that may sound familiar to you because the Airport Improvement Program specifically was at issue in the Paralyzed Veterans case. It is a program, Your Honors, of the Airport and Airway Improvement Act. And in that case, the Supreme Court has already held that grants under the Airport Improvement Program do not count as federal financial assistance to commercial airlines. At most, they go to the operator of the airport. There's no evidence in this record that Southwest operates Love Field. On the contrary, the evidence is that the City of Dallas owns the airport. Thank you. In my last few seconds here, Your Honors, the other thing that I wanted to make sure I have a moment to touch on, if I may, is the record on appeal. This has been fully briefed. I don't think I have much to add except to highlight it, that there are these two discovery rulings that are sort of swirling around. We wish to make very clear that this is an appeal from a summary judgment ruling. That's what it was in the Notice of Appeal and the Dockening Statement. And the only order attached to the opening brief under the Court's local rules was the summary judgment brief. So we think that these discovery orders have not been appealed. And if the Court is inclined to consider them as to the tax returns and the request for production, we think that the argument is quite thin in the briefing and there are no grounds to overturn the District Court's discretionary ruling. And as to privilege, the same applies in addition to the actual content of the one letter in question is also in the record itself as part of emails to the EEOC. Thank you, Counsel. Thank you, Your Honors. Ms. Donnelly? Your Honors, I would like to touch upon a few issues. The first one as to the Grants Paralyzed Veterans. It was undisputed that the airline was not carrying the debts from that transaction on their assets. The airline was not representing to their shareholders that they have invested millions of dollars in that and representing it to various courts. In this case, unlike the Paralyzed Veteran and all other cases, we have the distinctive fact that as defined by the Southwest, has been carrying those and depreciating those assets as it has represented to the SEC. As to the issues of fact, as Your Honors already pointed out, Judge Bell, Judge Madison, these are all disputed questions of fact. And the fact that Southwest can stand up here and say that she received reasonable accommodations does not make it so. That's a summary judgment. That's why these questions go to the jury. What Southwest wants to do is to just close the door. This seems to kind of focus on those last few days of training at the gate. And Mr. Carroll said that there's going to be 40 or 50 pages in the appendix that we're going to find the detail exactly what training was provided at the gate. Do you agree with that? Because if you both agree with that, then I know where I'm going to look as quickly as I can. It's going to be those 40 or 50 pages. I think Your Honor, you should look at that. And that is 40 and 50 pages of email exchanges between different people who had no idea and were not informed that Mrs. Ratford has a disability. Those are the exchanges between parties as to what they should do with her. Unfortunately, it doesn't have any mention of any procedures, any policies as to how do you train somebody with a disability. And I would ask the court to please take judicial notice on the 201 of Southwest's own website, where it declares to the public of how amazing they are in training their trainers, how important it is to train the trainers to know how to deal with people with disability. But then you look at actions, and unfortunately, they're far, far away. Now they're asking Ms. Edmonds Ratford to wear something purple and have her ponytail as she's announcing her disability. Did Ms. Edmonds Ratford, other than saying that she had a learning disability, did she address the specific nature of it? Did she present any medical evidence of it? Is there anything beyond just saying that there was a learning disability? Of course, Your Honor. There hasn't been any question that she does have a disability. Southwest has never disputed that. Yet, during the positions, Ms. Parnell... Well, but you're also contending that the training was insufficient, but wouldn't Southwest need to have some information about how to tailor the training by knowing a little bit more about why she was having trouble learning the job? I completely understand, Your Honor, and that is accurate. That's why we are referring the court to the specific chapters from her deposition, where Southwest asked her, what were your disabilities? She explains, my son died. My only son was killed in a shooting. After that, I have had severe depression. I have a learning disability, ADHD. I have had anxiety as a result of that. Are you talking about... Counselor, are you talking about post... You're talking about during litigation where she explains the what... I mean, we're talking about what did she say about her disability, and did she ever provide any medical information? Did she go to the proper authority within the company that she was aware of to report that she had a disability and was requesting accommodation so that they could then seek medical information or justification for that and get some input about what kind of accommodation would be appropriate? Yes, Your Honor. That's why I beg the court to look at the record on pages volume 2, 686, 87, 698, 691, and 92, and 699, where she's asked specifically, what did you tell them? She says, I told them in Dallas, I have a learning disability. That was told to the trainer who trains other trainers in Dallas. They didn't have that in Dallas. What was the difference? Why did you think that you could reinstate her? Well, we didn't provide these trainings before. We were planning to do them that were adequate in an environment that is controlled, where she can actually take her time, learn the procedures, and then apply it. But most importantly, as Judge Bell's recent opinion in Aubrey states, you have the duty to engage in interactive process. Southwest has said, we are one of the biggest. We have 4,000 employees in Denver, 4,000 jobs. Is Southwest suggesting that they couldn't find one more job for this woman in Denver that didn't have all these other requirements that would put her in turmoil at the gate? They have not engaged in that. And these are all coming down to the issue of fact as to whether they knew about her disability. We have the testimony under oath in a deposition, which is enough under summary judgment legal standards to go forward. Yet Southwest stands here and says, close the door into everybody. Council, you're over time. If you can complete your thought, we'll... Okay. The last point was that when you look at the facts and the AirTran piece on its own, it was $72 million in loan when they acquired AirTran. And that was indicated in the tax returns which they never produced. Thank you so much for the opportunity for me to finish this. We really appreciate it and we ask for reversal. Thank you. Thank you, council. Thank you, Mr. Carroll and Ms. Donnelly. The case will be submitted and council are excused.